UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 17-80013-CR-MIDDLEBROOKS/BRANNON

UNITED STATES OF AMERICA

v.

JOAQUIN MENDEZ,

Defendant.

_____/

## FACTUAL PROFFER

Defendant Joaquin Mendez, his counsel, and the United States agree that, had this case proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt, and the following facts are true and correct and are sufficient to support a plea of guilty:

1. At all times relevant to the Indictment, substance abuse treatment was regulated under state and federal law. Pursuant to Florida's Marchman Act, licensed service providers could offer substance abuse services to include a "comprehensive continuum of accessible and quality substance abuse prevention, intervention, and clinical treatment services." Fl. Stat. § 397.311(24) & (25). "Clinical treatment" meant "a professionally directed, deliberate, and planned regimen of services and interventions that are designed to reduce or eliminate the misuse of drugs and alcohol and promote a health, drug-free lifestyle." Fl. Stat. § 397.311(25)(a).

2. At all times relevant to the Indictment, the Marchman Act made it unlawful for any person or agency to act as a substance abuse provider unless it was properly licensed. Fl. Stat. § 397.401(1); Fl. Admin. Code § 65D-300.003(1)(a).

3. To insure the legitimacy of substance abuse service providers and to protect the health and welfare of patients, all substance abuse service providers personnel, including all owners, directors, and chief financial officers, had to pass a "level 2 background screening," including "fingerprinting for statewide criminal history records checks through the Department of Law Enforcement, and national criminal history records checks through the Federal Bureau of Investigation." Fl. Stat. §§ 397.451(1)(a)(1), 435.04(1)(a). The Act also made it a criminal offense to operate or attempt to operate as a

service provider with personnel who did not pass the background test. Fl. Stat §§ 397.403(1)(e)(1); 397.461. Despite these laws, the substance abuse treatment centers mentioned in the indictment, Journey to Recovery and Reflections Treatment Center, applied for and received licenses and operate as service providers by hiding the fact that co-defendant Kenneth Chatman, who had a prior federal felony conviction, owned Journey and Reflections and was their Chief Operating Officer.

4. The Patient Protection and Affordable of 2010 ("ACA"), Pub L. 111-148, and other federal laws expanded the availability of private insurance to pay for substance abuse treatment in several ways. First, the ACA allowed parents to maintain health insurance for their children through their own insurance policies until the children reached the age of 26. Second, federal law mandated that substance abuse treatment and other mental health treatment must be covered and reimbursed by insurance policies in the manner and at the same levels as other medical treatment. Third, the ACA required insurance companies to cover individuals regardless of prior existing conditions. Fourth, annual and lifetime caps on coverage were removed. Fifth, the ACA created insurance exchanges that allowed uninsured individuals to apply for and obtain coverage from private insurers. The combination of these provisions created insurance coverage for patients and substance abuse treatment that have previously been excluded from coverage. Federal health care benefits programs were likewise expanded.

5. These federal laws created access to coverage through a number of avenues, including health plans sponsored by private employers, federal health care benefits, and health plans offered directly by private insurance companies. Private insurance companies administer health plans sponsored by private employers and governmental employers. Health plans sponsored by private employers are governed by the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, while those sponsored by governmental employers and certain others are exempt from ERISA's jurisdiction.

6. The Federal Employees Health Benefits Program ("FEHBP") provided medical benefits, items and services to federal employees and their dependents, including substance abuse services. The United States Office of Personnel Management ("OPM") managed the FEHBP and contracted with various insurance companies to offer these benefits. FEHBP reimbursed those insurance companies out of government funds for the money the insurance companies paid out for medical benefits, items and services for federal employees and their dependents. BlueCross/BlueShield ("BCBS") was one of the various insurance companies contracted by OPM to offer medical benefits, items and services to federal employees under the FEHBP.

7. The National Railroad Passenger Corporation, doing business as Amtrak ("Amtrak"), was a private, for profit, Government corporation, that operated a nationwide

system of passenger rail transportation. As part of its employee benefits package, Amtrak established employee health and welfare benefit plans to provide healthcare to their employees, including their spouses, domestic partners, and dependent children (collectively, "dependents").

8.  Both ERISA and non-ERISA health benefit plans, including ACA plans, were offered or administered by private insurance companies, including BCBS, Aetna, Cigna Behavioral Health, Cigna Health & Life Insurance, United Behavioral Health, and United Health Group.

9.  All of these health benefit plans were "health care benefit program," as defined in Title 18, United States Code, Section 24(b), that is, "public or private plans or contracts, affecting commerce, under which any medical benefit, item or service is provided to any individual."

10. Regardless of the type of plan held by a patient, the amount of coverage and terms and conditions of billing and payment were governed by the terms of the individual's insurance documents, and the insurance company administering the plan had the authority, responsibility, and discretion to make coverage determinations and to process and make payments on claims.

11. Chapter 817 of the Florida Statutes, known as the "Florida Patient Brokering Act," made it a felony for any person, health care provider, or health care facility, including any licensed substance abuse provider, to: "(a) Offer or pay any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engage in any split-fee arrangement, in any form whatsoever, to induce the referral of patients or patronage to or from a health care provider or health care facility; (b) Solicit or receive any commission, bonus, rebate, kickback, or bribe, directly or indirectly, in cash or in kind, or engaged in any split-fee arrangement, in any form whatsoever, in return for the acceptance or acknowledgement of treatment from a health care provider or health care facility; or (d) Aid, abet, advise, or otherwise participate in the conduct prohibited under paragraph (a), paragraph (b), or paragraph (c)." Fl. Stat. § 817.505.

12. Florida law also stated that it "shall constitute a material omission and insurance fraud… for any service provider, other than a hospital, to engage in a general business practice of billing amounts as its usual and customary charge, if such provider has agreed with the insured or intends to waive deductibles or copayments, or does not for any other reason intend to collect the total amount of such charge." Fl. Stat § 817.234(7)(a).

13. Under state and federal law, health benefit plans were only responsible for claims for services that: (a) were "medically necessary," (b) were actually and lawfully

rendered; (c) were provided by a properly licensed service provider, and (d) complied with the terms of the health care plan, including the obligation to pay co-insurance and deductibles.

14. Bodily fluid testing could be used to detect recent drug or alcohol use by a client by conducting various tests on a client's urine, blood, and saliva. Urine Analysis or urinalysis ("UA") testing complexity ranged from screening tests – also known as point of care ("POC") testing – which provided instant results, to confirmatory testing, which was sent to a laboratory, for more complex analysis. Laboratories could also conduct complex analysis on blood and saliva samples.

15. Like other medical tests, bodily fluid testing could be billed to insurance and reimbursed pursuant to the terms of the insurance policy. Insurance companies were only responsible for claims for testing that were "medically necessary," actually performed, properly prescribed, and lawfully conducted by a properly licensed service provider, and conducted and billed in compliance with the law and terms of the health care plan, including the obligation to pay co-insurance.

16. POC urine testing involved collecting a patient's urine in a specific cup designed for testing. The specimen was analyzed using a color banded or numbered dipstick, allowing for visual positive or negative results. POC urine testing usually tested for the presence of 9 to 13 specific types of drugs, including the most common drugs of abuse like cocaine, opioids, and heroin. POC tests typically cost between $5 and $10 and could be read easily by a layperson.

17. Confirmatory testing, conducted in a laboratory setting, made use of gas liquid chromatography, mass spectrometry, and/or gas chromatography, or high performance liquid chromatography, to analyze the patient's urine, blood, or saliva specimen. These techniques were highly sensitive, and accurately and definitively identified specific substances and the quantitative concentrations of the drugs or their metabolites. Confirmatory testing could detect a wider range of controlled substances and metabolites – up to 100 or more substances, referred to as "panels." The prescribing physician could request that the lab test only for those panels directly related to a patient's drug use history. Laboratories billed each panel separately, so prescribing more panels for testing resulted in higher bills.

18. Reflections Treatment Center was located at 5100 Coconut Creek Parkway, Margate, Florida, in Broward County, in the Southern District of Florida. Reflections purported to operate as a licensed "substance abuse service provider" or "treatment center," that is, it purportedly offered clinical treatment services for persons suffering from alcohol and drug addiction. Reflections submitted an application for licensure in January 2014 and

received a license on April 30, 2014. As noted above, although co-defendant Kenneth Chatman had a federal criminal conviction that prohibited him from owning or operating a substance abuse service provider, Chatman owned and served as the Chief Operating Officer of Reflections, including making all financial decisions.

19. Defendant Joaquin Mendez was a licensed medical doctor in the State of Florida, and was listed on licensure documents as the medical director of Reflections from January 2014 to May 2014, and from September 2014 to October 2015. Defendant Mendez did not sign a contract with or perform services for Reflections until September 2014 and gave written notice of termination on September 9, 2015. As medical director, Mendez was purportedly responsible for evaluating patients and prescribing medically necessary treatment and testing. Mendez was hired by Chatman and paid by Chatman through Care MD, LLC, which was a corporation owned by Mendez.

20. Instead of Defendant Mendez using his medical expertise and his individual assessments of patients to decide what type of laboratory testing was needed by each patient, co-defendant Kenneth Chatman dictated the type and frequency of different types of lab testing that would be performed based upon the kickbacks and bribes that he was receiving from different clinical laboratories. Chatman dictated that confirmatory urine drug testing on dozens of panels for street and prescription drugs would be performed three days per week and duplicative saliva drug testing would occur. Mendez facilitated this testing by signing doctor's orders for urine drug tests and certificates of medical necessity for saliva drug tests, although Mendez had never seen some of the patients.

21. Based upon Chatman's instructions, "standing orders" were prepared and provided by clinical labs. Rather than selecting individual drug tests based upon a patient's drug use history, period of sobriety, or any other individualized evaluation, Reflections' Medical Directors, including defendant Mendez, signed these "standing orders" that authorized testing patients before the patients had even seen the doctor. At some point, Mendez learned that Reflections' patients were being saliva tested three times per week, in addition to urine testing three times per week. Mendez objected and stated that saliva testing should only occur once per week. None of this testing could be billed to patients' insurance companies without Mendez' authorization.

22. Defendant Mendez examined treatment center patients and billed those patients' insurance plans for those examinations. Defendant Mendez submitted and caused the submission of bills to the patients' insurance plans using procedure codes that reflected more complex and lengthier examinations than Mendez actually performed.

23. Defendant Mendez signed off on hundreds of certificates of medical necessity for urine and saliva testing after the testing had actually been done, and in some

cases, after the patients had been discharged from Reflections. Mendez electronically signed these tests stating there was medical necessity despite not reviewing the results. If Mendez had closely monitored the drug test results, he would have realized that most of the patients at Reflections were continuing to abuse drugs. Mendez did not use the results of any of the lab testing in order to direct the treatment of the patients. Mendez knew that insurance claims for the medically unnecessary tests that he prescribed would be submitted to the patients' insurance companies.

24. Defendant Mendez refused to sign certificates of medical necessity for urine and saliva drug testing and refused to review test results due to a financial dispute he had with Chatman. Chatman eventually paid Mendez, resolving the financial dispute, which resulted in Mendez electronically signing hundreds of test results without conducting any substantive review or using those results to direct treatment.

BENJAMIN G. GREENBERG
ACTING UNITED STATES ATTORNEY

Date: 7/14/17    By: _____
A. MARIE VILLAFAÑA
ASSISTANT UNITED STATES ATTORNEY

Date: 7/13/17    _____
RICHARD LUBIN
ATTORNEY FOR DEFENDANT

Date: 7/13/17    _____
ANTHONY VITALE
ATTORNEY FOR DEFENDANT

Date: 7/13/17    _____
JOAQUIN MENDEZ, M.D.
DEFENDANT